Filed 11/18/20  In re Iris D. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re IRIS D., et. al., | B305090 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 19CCJP07097) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MARIA F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Peter R. Navarro, Judge.  Reversed in part and affirmed in part.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Maria F. (Mother) appeals from the juvenile court's February 11, 2020, jurisdictional and dispositional orders concerning her four children.  Mother does not contest the assertion of jurisdiction as a result of the conduct of the youngest child's father.  She contends, however, that as to her, substantial evidence does not support the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivisions (a) and (b).[1]  She further argues the dispositional orders requiring her to participate in classes and counseling are unnecessary and should be reversed.  We reverse the juvenile court's jurisdictional findings as to Mother, but affirm the dispositional orders.

### FACTUAL AND PROCEDURAL BACKGROUND

The minors at issue in this appeal are Iris (12 years old), Ivan (11 years old), Ishmael (nine years old), and Tamia (eight months old).[2]  Tamon D., the father of the three older children, is a non-offending parent in this matter.  Timothy J. is Tamia's

_____

[1] All unspecified statutory references are to the Welfare and Institutions Code.

[2] These were the children's ages at the time of the jurisdictional and dispositional hearing.

father (Father). As we describe below, Father's domestic violence against Mother forms the primary basis for the juvenile court's jurisdictional and dispositional orders. Father does not appeal these orders.

## A. Incidents of Abuse Between Mother and Father

At the time of the jurisdictional hearing, Mother and Father were married. Their relationship developed while Father was in prison for kidnapping. Almost immediately after Father's release from prison in October 2018, Father moved in with Mother and became physically abusive towards her.

On January 27, 2019, Mother was pregnant with Tamia. According to Mother, she and Father began to argue in their bedroom. Father hit Mother on the side of the head and pinched her. She felt dizzy, grabbed a broom to defend herself, and tried to leave their bedroom. When Father blocked her way, Mother struck him in the head with the broom and broke the wooden handle. Iris, Ivan, and Ishmael were in a separate room when this incident occurred. Iris entered the bedroom when she heard the commotion and tried to intervene. Mother reported the incident to law enforcement.

Following this incident, Father no longer lived at Mother's residence. According to Mother, as a result of the January 27, 2019, incident, Father went to jail for violating his parole terms. Beginning March 2019, Father's parole conditions were modified to prohibit him from contacting her or coming to her residence. The record does not reflect any incidents of domestic violence between January 27, 2019 and September 4, 2019. During this time, Tamia was born.

3

During a two-week period in September 2019, Father returned to Mother's apartment on three occasions, during which he was physically abusive towards her.

On September 6, 2019, at approximately 3:30 a.m., Father arrived at Mother's apartment, banged on the front door, and yelled. Not wanting to wake the neighbors, Mother opened the door. Mother had allowed Father to come to her residence to retrieve his belongings. Father loudly demanded his cell phone. She told him she did not have it and asked him to leave. Before he left, Father grabbed Mother's cell phone. She followed him outside to retrieve it. Father grabbed Mother around her neck and shoved her into the street. When an unknown passerby yelled at Father, Father removed himself from Mother, got into his car, and drove away. Mother ran back inside her apartment and called law enforcement. A sheriff's deputy who responded to the call observed red scratch marks along Mother's neck and chest. Mother declined an emergency protective order and stated she would seek a restraining order from the court.

The deputy asked Mother about a bruise to her left eye. She responded that on September 4, 2019, Father was at her residence and had thrown a plastic bottle at her. Later, when speaking to a social worker for the Department of Children and Family Services (DCFS), Mother denied the September 4, 2019, incident had occurred.

On September 17, 2019, Mother heard a knock on her front door. She did not see anyone and opened her screen door, presumably to get a better look outside. She saw Father, who pushed her into the apartment and shouted at her, "Bitch, where my keys at?" Mother turned to go to her bedroom to call law enforcement, and Father punched her in the face. Mother's nose

4

began to bleed, and she screamed that she would call the police. Father ran out of the apartment. The children were home and asleep during the incident. It is not clear from the record whether any of the children was present in the room where Father hit Mother. Mother woke the children and went to the hospital.

At the hospital, a sheriff's deputy observed dried blood on Mother's nose and bruising and swelling under her left eye. Mother requested and received an emergency protective order.

On September 18, 2019, Mother sought a domestic violence restraining order against Father, seeking orders that Father stay away and not contact her or any of the four children. She also sought sole custody of their daughter, Tamia, with no visitation for Father. In her request for the restraining order, Mother stated that she had made three prior reports to law enforcement about Father's abuse; the children witnessed Father punch her; and Father threatened to have her killed if he returned to prison. She further explained, "It has been over 16 times [that] he has hit me but as I was afraid for my life[, I] did not make a report."[3]

On September 25, 2019, Father was arrested and placed in in custody.

A social worker interviewed Mother and the three eldest children on September 19, 2019, and December 10, 2019. During the September 19, 2019 interviews, each of the three children reported they felt safe and well cared for and that Father never abused them. Iris acknowledged that she witnessed at least a

---

[3] The juvenile court dismissed Mother's request for a civil restraining order due to the issuance of a domestic violence criminal protective order on October 31, 2019.

portion of the January 2019 incident. Ishmael stated he would become sad when Father was "mean" to Mother, but was unable to describe how Father was mean other than "telling [Mother] stuff." The social worker observed Tamia, the infant, was appropriately groomed, appropriate in affect, awake and alert, did not seem uncomfortable or in pain, and had no marks or bruises indicative of abuse or neglect.

During the interview on December 10, 2019, Ishmael reported Father "would hit [him] in the knee." Ishmael also stated they were "playing around," and that Father was not angry. Nonetheless, Ishmael indicated he was afraid of Father.

On October 31, 2019, a three-year domestic violence criminal protective order was issued against Father. Among other things, the protective order prohibits Father from having contact with Mother or coming within 100 yards of her, except as authorized by a family, juvenile, or probate court order.

Prior to the jurisdictional and dispositional hearing, Mother and the children attended counseling through the Victims of Crime program. By December 11, 2019, Mother had attended 25 counseling sessions out of the 40 sessions authorized by this program, and Iris had attended 23 sessions. Mother had enrolled Ishmael and Ivan in counseling as well. Mother also began a 12-week parenting course on October 29, 2019. By January 29, 2020, Mother completed the course, obtained her certification to teach the course, and became a course instructor. On December 19, 2019, Mother also enrolled in additional group therapy classes for survivors of domestic abuse. As of February 10, 2020, Mother completed 10 out of 15 of the group therapy sessions.

6

**B.     Prior History of Abuse Involving Mother and Tamon**

Mother and Tamon began dating in 2005, when Mother was 15 years old. They were in a relationship for seven years. According to Mother, Tamon sustained a brain injury in 2012, and his parents have a power of attorney over him.

In 2006, 2007, and 2009, DCFS received referrals of child abuse and neglect that it determined were unfounded.

Additionally, on November 13, 2007, DCFS received a referral of domestic violence between Mother and Tamon. As a result, he moved out, and Mother obtained a restraining order against him. DCFS determined the allegations were inconclusive. During a December 10, 2019, interview with a social worker, Mother acknowledged Tamon had been abusive.

In 2008, DCFS received a referral alleging that Mother and Tamon had a physical altercation during which Tamon accidentally hit Iris. DCFS dismissed this referral as inconclusive.

In September 2012, Iris, Ivan, and Ishmael were in their godmother's care. The godmother left the children unsupervised with Tamon, who had diminished mental capacity. Ivan was later observed to have marks on his lower back, which both Iris and Ivan stated were a result of Tamon hitting Ivan with his hand.

In May 2013, Iris, Ishmael, and Ivan were declared dependent children of the court under section 300, subdivision (b), based on a finding that the children's father, Tamon, was unable to provide the children with the appropriate parental care and supervision due to his mental health and medical condition. In September 2013, the dependency case was terminated.

7

In November 2016, DCFS received referrals alleging abuse by Mother and by Tamon against the three older children. DCFS terminated the referrals as inconclusive.

## C.    The Juvenile Court's Proceedings

On November 1, 2019, DCFS filed a dependency petition alleging the children came within the juvenile court's jurisdiction under section 300, subdivisions (a) and (b)(1). In count a-1, alleging the children had suffered, or there was a substantial risk they would suffer, serious physical harm, DCFS charged Father with committing several acts of physical abuse against Mother, citing the three incidents in September 2019, as well as other prior incidents of violence. Count a-1 charged that Mother also engaged in abuse by hitting Father on the head with a broom in January 2019 in the presence of the children.

Count b-1 charged that Mother failed to protect the children by allowing Father to reside in the home and have unlimited access to the children. Despite the allegations against Mother, DCFS concluded, "due to [M]other's filing for a restraining order on [September 19, 2019] and following the restraining order until now, DCFS recommends the children remain in the care of [M]other with [family maintenance] services in place."

At the November 4, 2019, detention hearing, the juvenile court made prima facie detention findings for the three older children and released them to parental custody. It also ordered Tamia detained from Father and released to Mother.

In its December 31, 2019, jurisdiction and disposition report, DCFS confirmed that "[i]t does not appear that the children—Iris, Ivan, Ishmael and Tamia—are at risk of abuse or harm while in the care of [M]other, at this time."

At the February 11, 2020, jurisdictional and dispositional hearing, Father advised the juvenile court that he had been sentenced on January 29, 2020, to four years in state prison, and he expected to serve 66 percent of that sentence, or almost 32 months.

The juvenile court sustained both counts as pleaded. It commented that "there's a serious level of violence that has been perpetrated by [Father]" involving multiple incidents. The juvenile court determined the children fell within the court's jurisdiction under section 300, subdivisions (a) and (b), declared the children to be dependents of the juvenile court, and ordered Mother to participate in a domestic violence victim's support group and parenting classes, as well as individual therapy.

Mother filed a timely notice of appeal.

## DISCUSSION

### A.    The Juvenile Court's Jurisdictional Findings

1.    *Standard of Review*

We review the trial court's jurisdictional findings for substantial evidence. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) Under this standard, " 'we must uphold the . . . [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support [them].' " (*Ibid.*)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is

9

supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

In this case, the juvenile court's assertion of jurisdiction based on the conduct of Father is not challenged, and there is no basis to disturb its order on appeal.  Nonetheless, as to the court's specific findings, "we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Here, Mother has become an instructor of the parenting courses she completed and hopes to become a licensed foster parent provider.  She contends the juvenile court's findings deeming her to be an offending parent will impair her ability to pursue these vocations.  Moreover, a finding that Mother is an offending parent may have implications with respect to future dependency proceedings.  (See *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 763.)  Thus, although dependency jurisdiction over the children will remain in place based on the unchallenged findings concerning Father's conduct, we review Mother's appeal on the merits.

2.  *Substantial Evidence Does Not Support the Juvenile Court's Finding Under Section 300, Subdivision (a) as to Mother*

For a child to come within the jurisdiction of the juvenile court under section 300, subdivision (a), the court must find "[t]he

10

child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Substantial risk of serious future physical injury may be established "based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (*Ibid*.)

In this case, there was no evidence that either parent inflicted serious physical harm on the children. Therefore, the assertion of jurisdiction is premised on a finding that the domestic violence in the home placed the children at substantial risk of serious future physical injury.

Mother's past involvement in incidents of domestic violence does not support a finding of a current risk of future serious physical harm to the children. Incidents of domestic violence between Mother and Tamon are remote in time, occurring between eight to 13 years prior to the jurisdictional hearing. Since that time, there have not been any allegations of domestic violence between them. Further, due to his medical condition, Tamon is under the care of his parents. Accordingly, future instances of domestic violence between Mother and Tamon are extremely unlikely.

Similarly, there was no evidence of a risk that domestic violence between Mother and Father would continue. In fact, the evidence was to the contrary. At the time of the jurisdictional hearing, Father was incarcerated and was expected to serve another two and one-half years. A three-year criminal protective order requires him to stay away from Mother and her residence.

11

The social worker did not uncover any evidence of physical abuse of the children, other than Ismael's comment that Father "would hit [him] in the knee" while "playing around."  Indeed, DCFS acknowledged in its December 31, 2019, report that "[i]t does not appear that the children . . . are at risk of abuse or harm while in the care of [M]other, at this time."  Any suggestion that Mother will enter into another abusive relationship is speculative, especially in light of her participation in parenting programs and victim therapy.

Furthermore, Mother's use of a broom to hit Father during the January 2019, incident is not indicative of a future risk of harm to the children.  This was the only incident documenting Mother's use of physical force in altercations involving Father.  It is apparent from the record that she used the broom in a defensive posture in response to Father's attack.  Father has not lived with Mother since that incident, rendering the possibility that she might resort to force to defend herself from Father in the future improbable.

In summary, the evidence was insufficient to support a finding that Mother's involvement in past incidents of domestic abuse created a current substantial risk of serious physical injury to the children.

3. *Substantial Evidence Does Not Support the Juvenile Court's Finding Under Section 300, Subdivision (b) as to Mother*

The juvenile court also sustained jurisdiction over the children under section 300, subdivision (b)(1), which requires proof that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to

adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ."  (§ 300, subd. (b)(1).)

The juvenile court's finding under section 300, subdivision (b) was based on its finding that Mother failed to protect the children from instances of domestic violence between Mother and Father.  "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) *but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm.*"  (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, italics added, citing *In re Janet T.* (2001) 93 Cal.App.4th 377, 391.)  "This is so because under subdivision (b) [of section 300,] a child may be considered dependent 'only so long as is necessary' to protect the child from risk of suffering serious physical harm or illness."  (*In re Janet T.*, *supra*, at p. 388.)

As we described above, at the time of the jurisdictional hearing, there was no evidence that the violence between Mother and Father was ongoing or likely to continue.  Furthermore, Mother contacted law enforcement during the January 2019 incident, and did not resume living with Father afterward.  Although she allowed him to come to the home on September 6, 2019, it was for the limited purpose of retrieving his belongings.  There is no evidence to indicate she invited Father to come to her residence on September 4, 2019, or September 17, 2019.  She contacted law enforcement during the September 6 and 17, 2019, incidents, and after the September 17, 2019, incident she obtained an emergency protective order and a domestic violence temporary restraining order.  In her petition for a restraining

13

order, she sought orders keeping Father away from all the children, and ordering no visitation with Tamia. She enrolled herself and the children in counseling before the jurisdictional hearing, and had attended 25 counseling sessions as of the date of the hearing. She took a parenting course and became a course instructor, and commenced group therapy sessions for survivors of domestic violence. Based on her proactive pursuit of legal protection and preventative therapies, as of the date of the jurisdictional hearing, it is not possible to conclude there was a substantial risk the children would suffer serious physical harm as a result of Mother's failure to protect them. (Cf. *In re E.B.* (2010) 184 Cal.App.4th 568, 576 [holding substantial evidence supported a finding that the mother failed to protect the children from the father's domestic abuse where the mother remained in abusive relationship and returned to the father despite the abuse], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re S.O.* (2002) 103 Cal.App.4th 453, 462 [same where the mother allowed the father to have unsupervised contact with the children close in time to the jurisdictional hearing and was unsure if she would reunite with him].) Thus, we reverse the juvenile court's jurisdictional findings under section 300, subdivisions (a) and (b)(1) as to Mother.

**B.   The Juvenile Court Did Not Abuse Its Discretion in Ordering Mother to Participate in Classes and Therapy**

Mother also argues that the juvenile court abused its discretion in ordering her to participate in group therapy, individual counseling, and parenting classes because she had already participated in such therapy, counseling, and classes.

14

DCFS argues Mother forfeited any appellate challenge to the dispositional orders as a result of her failure to object to the orders in the juvenile court. We disagree. After delivering its factual findings as to jurisdiction, the trial court asked for arguments relating to disposition. In response, Mother asked the juvenile court to award her full custody of Tamia and close the case. Mother argued, in the alternative, that she "has made some progress in her recommended case plan." Mother referred to the exhibits she had provided to the court, which included letters describing her progress in the parenting courses, group therapy program, and individual therapy. Mother's argument may be fairly characterized as an objection to further counseling and classes. In any event, we may exercise our discretion to consider Mother's challenge on the merits. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order" in accord with this discretion. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) Where jurisdiction exists over the child, the juvenile court may require even a non-offending parent to participate in educational and counseling programs that "the court deems necessary and proper." (§ 362, subd. (d); *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.)

"On appeal, [the juvenile court's] determination cannot be reversed absent a clear abuse of discretion." (*In re Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 474.) A court abuses its discretion when it makes a determination that is " ' "arbitrary, capricious,

or patently absurd." ' " (*In re Mark V.* (1986) 177 Cal.App.3d 754, 759, quoting *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.)

We conclude the juvenile court did not abuse its discretion in ordering Mother to attend classes and counseling in addition to those programs she had already completed. The evidence revealed a significant degree of abuse perpetrated by Father before Mother ended contact with him in January 2019. Given this history, and the fact the children remained in Mother's care, it was not unreasonable to require her to participate in additional counseling and educational services. Furthermore, Mother has not demonstrated that the courses and counseling in which she previously participated were also DCFS- or court-approved, that they are duplicative of the courses and counseling ordered by the juvenile court, or why participating in such services, even if duplicative, is unreasonable, arbitrary or capricious.

## DISPOSITION

The juvenile court's jurisdictional findings in counts a-1 and b-1 as to Mother are reversed. In all other respects, the order is affirmed.

NOT TO BE PUBLISHED

FEDERMAN, J.*

We concur:


CHANEY, J.                    BENDIX, Acting P. J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16